## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Fort Pierce Division

| | |
|---|---|
| WILLIAM SACCO, on behalf of himself and all others similarly situated,<br><br>               Plaintiff,<br><br>    v.<br><br>AARP, INC., AARP SERVICES INC., AARP INSURANCE PLAN, UNITEDHEALTH GROUP, INC., and UNITEDHEALTHCARE INSURANCE COMPANY,<br><br>             Defendants. | Civil Action No. |

### CLASS ACTION COMPLAINT, DEMAND FOR JURY TRIAL, INJUNCTIVE RELIEF SOUGHT

Plaintiff William Sacco ("Plaintiff"), individually and on behalf of all other similarly situated, brings this Class Action Complaint against the herein-named defendants, and upon information and belief, except as to the allegations within Plaintiffs personal knowledge, alleges as follows:

### JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below (the "Class"), is a citizen of a different state than defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District, the named plaintiff

resides in this District, and because defendants (a) are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution, and sale of "AARP-branded" Medicare supplement insurance policies ("AARP Medigap") in this District; (b) conduct substantial business in this District; and (c) are subject to personal jurisdiction in this District.

## SUMMARY OF THE ACTION

3.      This is a consumer class action seeking to recoup millions of dollars on behalf of a class of senior citizens and disabled individuals residing in the State of Florida who, by the deceptive practices and unlawful acts alleged herein, were fooled into paying artificially inflated insurance charges for Medicare supplemental health insurance policies so that defendants could use the inflated portion of the payment for illegal purposes – namely the payment of insurance commissions to an unlicensed entity.

4.      Defendant AARP, Inc., along with its subsidiaries (collectively, "AARP"), formerly known as the American Association of Retired Persons, is a tax-exempt, "non-profit" membership organization for seniors aged 50 years and older.  AARP has long been regarded as a protector and advocate of the nation's senior community, and today AARP is reported to have over 40 million members – about half of whom are over the age of 65, and all of whom recognize and trust the AARP name.

5.      Despite its "non-profit" status, however, AARP reaps substantial income through business partnerships with large insurance companies like defendants UnitedHealth Group, Inc. and UnitedHealthcare Insurance Company (collectively, "UnitedHealth") in the form of commissions.

6.      As alleged herein, defendants AARP and UnitedHealth, together and through their

2

respective subsidiaries (collectively, "Defendants"), have orchestrated an elaborate scheme where AARP, as the de facto agent of UnitedHealth, helps market, solicit and sell or renew AARP Medigap policies and generally administers the AARP Medigap program for UnitedHealth, in exchange for a 4.95% commission from each new policy or renewal.

7.      While Defendants disclose the existence of a payment in general that goes from UnitedHealth to AARP, which they call a "royalty" for the use of AARP's intellectual property, Defendants hide the fact that the payment to AARP is actually a percentage of premium commission that is charged to unsuspecting seniors and the disabled in addition to their insurance premium paid to UnitedHealth for coverage.

8.      Defendants' motive to term a commission payment a "royalty" is two-fold: it allows AARP to avoid oversight by insurance regulators, and it allows AARP to avoid paying taxes on the income it generates through insurance sales.  Calling the commission payment a "royalty" is merely a fiction created by Defendants to further their illegal scheme.

9.      Indeed, other associations similar to AARP do the right thing and acquire a license to act as an agent, subjecting themselves to regulatory oversight, and paying taxes.[1]

10.     As detailed herein, Defendants' acts are unlawful because they violate the Florida Insurance Code ("Code").  For example, despite the fact that AARP is not licensed as an insurance agent in the State of Florida, it regularly acts as the de facto agent for UnitedHealth by helping market, solicit and sell AARP Medigap policies in exchange for a 4.95% commission from every policy sold or renewed.  These activities violate multiple provisions of the Code. *See, e.g.*, Fla. Stat. Ann. § 626.838(2) (prohibiting any person "other than a licensed and appointed health agent" from accepting a commission); Fla. Stat. Ann. § 626.112 (requiring a

---

[1] The automobile club AAA, for example, is licensed to sell insurance.

license "to engage in the solicitation of insurance," including "[d]escribing the benefits or terms of insurance coverage, "[m]aking general or specific recommendations as to insurance products," and "[c]omparing insurance products.").

11.     Because AARP is not licensed as an insurance agent, it may not collect a commission for its marketing, soliciting or selling/renewing of AARP Medigap policies on behalf of UnitedHealth.

12.     The end result of Defendants' violations of the Code is that consumers are charged an artificially inflated amount for insurance coverage that is prohibited by law.  Put differently, Plaintiff was injured by the actual loss of the 4.95% commission payment and paid more for his AARP Medigap policy because of Defendants' challenged conduct.

13.     If Defendants' had acted within the bounds of the law, Plaintiff would have only been charged for Medigap insurance coverage from UnitedHealth, rather than Medigap coverage plus an illegal 4.95% commission.

14.     To be sure, similar Medigap policies offered without the "AARP brand" offer identical benefits often at a lower cost in part because those insurers do not secretly charge unlawful insurance agent commissions to consumers.

15.     Ultimately, Defendants' deceptive and unlawful scheme takes advantage of unsuspecting senior citizens and the disabled who, unfortunately, put their trust in the AARP name.

16.     But for Defendants' deceptive and unlawful acts, Plaintiff and the other members of the Class would not have agreed to pay the 4.95% illegal insurance commission secretly charged on top of their insurance premiums.

17.     Plaintiff and the Class were injured by the actual loss of the 4.95% commission

payment and paid more for AARP Medigap insurance because of Defendants' challenged conduct.

18.     Plaintiff brings this action on behalf of the Class for equitable relief and to recover damages and restitution for conversion and unjust enrichment.

## PARTIES

19.     Plaintiff William Sacco is a resident of Stuart, Florida.  He purchased an AARP Medigap policy in Florida in 2011 and has paid his premium for that policy every month since, including in January 2018.  But for Defendants' deceptive and unlawful acts, as alleged herein, Mr. Sacco would not have agreed to pay 4.95% above the premiums due to UnitedHealth for an AARP Medigap policy.

20.     Defendant AARP, Inc. is a non-profit corporation organized under the laws of the District of Columbia and maintains its primary place of business is at 601 E Street, NW, Washington, D.C. 20049.  AARP, Inc. conducts substantial business in the State of Florida.

21.     Defendant AARP Services, Inc. ("ASI") is a wholly-owned subsidiary of AARP, organized under the laws of Delaware.  ASI maintains its primary place of business at 601 E Street, NW, Washington, D.C. 20049.  ASI conducts substantial business in the state of Florida. ASI is AARP's taxable "for-profit" division that negotiates, oversees, and manages lucrative contracts with AARP's insurance business partners.  AARP created ASI in 1999 pursuant to a settlement agreement with the U.S. Internal Revenue Service ("IRS") resulting from an investigation by the IRS into the large amount of income that AARP, Inc., a "non-profit" tax-exempt organization, earned through its "endorsement" deals.  This settlement was one of several that AARP, Inc. entered into with the IRS and other entities, such as the U.S. Postal Service and the tax authorities of the District of Columbia, all relating to AARP, Inc.'s failure to

fully pay unrelated business income tax on its commercial activities, as well as improperly

mailing health insurance solicitations at non-profit rates.

22.     Defendant AARP Insurance Plan ("AARP Trust") is a grantor trust organized by

AARP, Inc. under the laws of the District of Columbia and maintains its primary place of

business at 601 E Street, NW, Washington, D.C. 20049.  AARP Trust is the vehicle through

which AARP, Inc. collects, invests and remits premium payments for AARP Medigap policies

and collects its unlawful 4.95% commission.  AARP Trust conducts substantial business in the

state of Florida.

23.     At all material times, defendant AARP, Inc. dominated and controlled defendants

ASI and AARP Trust.

24.     Defendants AARP, Inc., ASI and AARP Trust are collectively referred to herein

as "AARP."

25.     Defendant UnitedHealth Group, Inc. ("UnitedHealth Group") is an insurance

corporation organized under the laws of the State of Minnesota and maintains its corporate

headquarters in Minnetonka, Minnesota.  UnitedHealth Group conducts substantial business in

the State of Florida.  UnitedHealth Group is the largest single health insurer in the United States.

26.     Defendant UnitedHealthcare Insurance Company is an operating division and

wholly owned subsidiary of UnitedHealth Group and maintains its corporate headquarters in

Hartford, Connecticut.  UnitedHealthcare Insurance Company conducts substantial business in

the State of Florida.  AARP Medigap plans are insured by UnitedHealthcare Insurance

Company.

27.     Defendants UnitedHealth Group and UnitedHealthcare Insurance Company are

collectively referred to herein as "UnitedHealth."

## FACTUAL ALLEGATION

28.     Defendant AARP, formerly known as the American Association of Retired Persons, is a tax-exempt, non-profit membership organization for seniors aged 50 years and older.  AARP has long been regarded as the protector and advocate of the nation's senior community, and today AARP is reported to have over 40 million members – about half of whom are over the age of 65, and all of whom recognize and trust the AARP name.

29.     By any measure, AARP is a large, complex and sophisticated enterprise with over $3 billion in total assets and operating revenues of over $1.3 billion in 2012.

30.     Despite its "non-profit" status, however, AARP earns substantial revenue through business partnerships with large insurance companies, like defendant UnitedHealth, to sell its own "AARP-branded" insurance policies.

31.     Among other products, AARP endorses three types of Medicare-related insurance: Part D prescription drug insurance, Medicare Advantage, and Medigap.

32.     Medigap plans offer extra coverage to Medicare beneficiaries (*i.e.*, seniors and the disabled) enrolled in traditional Medicare, such as first-dollar coverage and reduced co-payment and deductibles.  In addition, all Medigap plans provide coverage for hospital stays and reduce seniors' out-of-pocket costs for physician office visits.  Medigap enrollees must pay a monthly premium that exceeds their Medicare premium in order to receive these additional benefits.  In 2012, over 10 million Americans were enrolled in a Medigap plan to supplement their traditional Medicare coverage.

33.     AARP Medigap is the dominant player in the Medigap market.  Nationwide, AARP Medigap has over three times as many Medigap enrollees as its closest competitor, Mutual of

Omaha.  As of December 2012, 32% of all Medicare beneficiaries enrolled in a Medigap insurance plan were enrolled in AARP Medigap.

34.     The only Medigap plans insured by UnitedHealth, again the largest health insurer in the country, are AARP Medigap plans.  Any consumer who wants to purchase Medigap coverage from UnitedHealth must purchase the AARP Medigap plan, and thereby unknowingly fund the 4.95% illegal commission to AARP.

35.     In 2012, AARP generated $704 million in revenues from its so called "royalties," which is nearly three times higher than income generated from membership dues, and makes up 52% of AARP's 2012 total operating revenue.

36.     Of the $704 million in total "royalty" income generated by AARP across all of its product offerings in 2012, $458 million (65%) came from UnitedHealth insurance products.

37.     In 2012 and 2011, the AARP Trust processed $7.8 billion and $7.5 billion, respectively, in insurance premiums from all sources. In 2012 and 2011, $376 million and $359 million, respectively, was paid to AARP as "royalties" from AARP Trust.

38.     Because of its tax-exempt status, the substantial income that AARP generates has drawn the attention of the IRS and the tax authorities of the District of Columbia on more than one occasion.

39.     In 1999, AARP entered into a settlement agreement with the IRS due to AARP's failure to fully pay unrelated business income tax on its commercial activities.  As part of that settlement, AARP created ASI to act as AARP's "for-profit" arm.  Even with the creation of ASI as a taxable entity, however, AARP still retains the vast majority of its income, tax-free.

**AARP and UnitedHealth's Scheme to Defraud Senior Citizens**

40.     According to AARP's 2010, 2011 and 2012 financial statements, UnitedHealth is

8

AARP's largest business partner - 65% of AARP's "royalty" income is consistently derived from the sale or renewal of UnitedHealth insurance products.  AARP's current AARP Medigap business relationship with UnitedHealth began on February 26, 1997, when AARP and UnitedHealth entered into a joint venture agreement entitled the "AARP Health Insurance Agreement" (the "Agreement").

41.     Under the terms of the Agreement, AARP would: (1) market, solicit, sell and renew AARP Medigap policies with UnitedHealth; (2) collect and remit premium payments on behalf of UnitedHealth; (3) generally administer the AARP Medigap program; and (4) otherwise act as UnitedHealth's agent.

42.     In exchange for its services, the Agreement provided AARP with a 4% "allowance" for every dollar received from the sale or renewal of an AARP Medigap policy, as well as an additional 2.5% for each dollar over $1 billion:

> ARTICLE 6
> ALLOWANCES AND COMPENSATION
> 10 6.1 AARP ALLOWANCE.  AARP shall be entitled to receive an allowance for AARP's sponsorship of the SHIP and the license to use the AARP Marks in connection therewith. ***For each Policy Year, this allowance shall be equal to the sum of (i) four percent of the first $1 billion in Member Contributions plus (ii) two and one-half percent of the Member Contributions in excess of $1 billion.***  This allowance shall be payable in accordance with Section 6.7 hereof.  (Emphasis added).

43.     The Agreement was amended in December 28, 1999 in connection with AARP's settlement with the IRS.  The 1999 amendment, inter alia, renamed AARP's "allowance" a "royalty" and directed 8% of AARP's "royalty" to its taxable subsidiary, ASI:

> It is intent [sic] of the parties hereto that the payment made by United to AARP pursuant to the United Agreement and referred to  as an allowance is a royalty and pursuant to this Assignment and the agreement referred to in this paragraph, the royalty is to be bifurcated into a payment to AARP Services for Quality Control

and monitoring and to AARP for use of the AARP Marks.  AARP shall grant United an exclusive license to use the AARP Marks by separate agreement.  Such separate agreement shall obligate United to compensate AARP for the use of its intangible property by the payment of a royalty.

44.    The Agreement was amended again on December 23, 2002 to increase the amount

of AARP's "royalty":

> 1.    Subsection 6.1 of the Agreement is amended by deleting
> this subsection in its entirety and replacing it with (sic) following:
> 6.1 AARP Royalty.  AARP shall be entitled to receive a
> royalty for AARP's sponsorship of the SHIP and the license to use
> the AARP Marks in connection therewith.  This royalty shall be
> 3.25% of Member Contribution for Policy Year 2002 and 3.75% of
> Member Contributions for Policy Year 2003.  For Policy Years
> 2004 through 2007, the royalty shall be 4% of Member
> Contribution, with a review of the increased royalty amount on
> rates and competitive position prior to implementation.

45.    In 2007, the parties extended the Agreement through to December 31, 2014, as

explained in UnitedHealth's quarterly report, filed with the U.S. Securities and Exchange

Commission ("SEC") on May 9, 2007:

> On April 13, 2007, we entered into an agreement to extend
> and expand our relationship with AARP through December 31,
> 2014.  The agreement was expanded to give us a right to use the
> AARP brand on our Medicare Advantage offerings and to *extend
> our arrangement to* use the AARP brand on our Medicare
> Supplement products and *services* and Medicare Part D offerings.
> (Emphasis added.)

46.    Six months later, the parties further extended the Agreement for an additional

three years through to December 31, 2017, as explained in UnitedHealth's 2007 yearly report

filed with the SEC:

> On October 3, 2007, we entered into four agreements with
> AARP that amended our existing AARP arrangements and
> incorporated many of the terms of the April 13, 2007 AARP
> agreement.  These agreements extended our arrangements with
> AARP on the Supplemental Health Insurance Program [AARP

Insurance] to December 31, 2017, extended our arrangement with
AARP on the Medicare Part D business to December 31, 2014, and
gave us an exclusive right to use the AARP brand on our Medicare
Advantage offerings until December 31, 2014, subject to certain
limited exclusions.

47.    On October 15, 2013, AARP and UnitedHealth announced that they were

extending the Agreement to run through December 2020.  Stephen J. Hemsley, president and

CEO of UnitedHealth Group, noted that "We are honored to build upon our unique and

innovative relationship with AARP, which has helped both UnitedHealthcare and AARP provide

better support and value to the consumers we serve."[2]

48.    Under the terms of the current Agreement, in exchange for AARP's administering

of the insurance program and the marketing, soliciting, and selling or renewing AARP Medigap

policies on behalf of UnitedHealth, as well as its collecting and remitting insurance premiums on

behalf of UnitedHealth, AARP earns a 4.95% commission, disguised as a "royalty," on each

policy sold or renewed.

49.    The Agreement's terms require AARP to aid in the solicitation of the sale of

insurance and to generally act as the insurance agent of UnitedHealth.

50.    The Agreement also specifically notes that AARP owns all solicitation materials

related to the AARP Medigap program:

7.2 MEMBER COMMUNICATIONS.
AARP OWNERSHIP.  All communications to AARP members
pertaining to the SHIP [AARP Medigap included], including
without limitation scripts, solicitation materials and other written
materials mailed on behalf of AARP to any members, shall be the
property of AARP, to the extent specifically identified by United
or AARP, as the case may be, as developed and used exclusively
for the SHIP. AARP shall have the sole right to copyright all or
any of such pieces as it considers appropriate to the fullest extent

---

[2] https://www.optum.com/about/news/unitedhealth-
grouptoextendbroadenitsrelationshipwithaarptofocusm.html.

permitted by law; provided, however, that AARP shall not have the right to copyright the United Marks.

51.     The Agreement as of 2011 was reviewed by Congressional staff members from

the House Committee on Ways and Means as part of its investigation into AARP's tax status.

AARP's obligations under the Agreement were described in a December 21, 2011 letter from the

Ways and Means Committee to the IRS as follows:

> Congressional staff recently had the opportunity to review three redacted contracts between AARP and AARP Services, Inc. (ASI) and United.  The contracts covered United's marketing and sale of AARP branded Medigap, Medicare Advantage, and Medicare Part D policies.  The contracts raised a number of issues related to AARP's involvement in for-profit business activities and governance issues among the various AARP entities.

> The three contracts, signed in January 2008 and which are still in effect, detail AARP and ASI's extensive influence over United's operations, most notably in the Medigap business, and several instances in which United is required to take specific actions, beyond making "royalty" payments, to the benefit of AARP.  The contracts include the following provisions that raise numerous questions about AARP's involvement in for profit activities:

> a.     ASI is placed in the role of quality control contractor and overseer of United's operations, as it relates to Medigap, Medicare Advantage, and Medicare Part D.

> b.     The contracts create a "Senior Leaders" team that oversees all aspects of performance under the contracts.  Both United and ASI each have two officials appointed to the "Senior Leaders" team, which coordinates all aspects of contract performance and must consent to any action under the contract. At least one United and one ASI "Senior Leader" must consent to any decision. Further demonstrating AARP's active role in directing the decisions of the insurer, ASI must approve United's appointments to the "Senior Leaders" team.

> c.     ASI has authority over United's "Operating Plan" and may "approve, modify on a line by line basis, or provide specific direction to United," regarding the plan.

d.      ASI is given prior review and approval authority over all proposed electronic, print, verbal, or scripted communication regarding AARP-endorsed Medigap plans directed at both AARP members and non-AARP members.

e.      United is responsible for marketing campaign audits and analysis, but all strategy developments and modifications must be made in collaboration with AARP.

f.      ASI oversees and monitors the agent certification process and must approve the agent compensation program.

g.      ASI has consultation, review, and consent rights related to any proposed plan design changes including, but not limited to, annual budgets, premium levels and rates, and sales and distribution plans.

h.      United is barred from directly or indirectly marketing or offering products or programs that compete with AARP-endorsed Medigap plans.

i.      ASI has review and modification authority over United's Medigap-related contracts with third-party vendors exceeding $250,000.

j.      United must submit to ASI a detailed projection of policy financials, including recommended member premiums for the coming year.  ASI may object to the premium levels, and if no agreement is reached the issue goes to dispute resolution.

k.      United may contract with ASI separately to perform consulting and marketing services in connection with the sale of AARP-endorsed Medigap plans.  Such agreements are separate from the primary contract but indicate the possibility of the AARP subsidiary's further involvement in business operations.

l.      United's annual incentive program for senior executives is, in part, dependent on meeting the "transformational" goals established by AARP and ASI.

m.      Any expenditure of Medigap funds not addressed in the contract requires the prior written approval of ASI.

52.     UnitedHealth compensates AARP to act as its agent in connection with the

marketing, solicitation, sale and administration of the AARP Medigap group insurance program.

53.     AARP actively helps solicit and market AARP Medigap for UnitedHealth through television commercials, its website, and advertisements in various periodicals and publications.

54.     AARP is engaged in actively soliciting consumers to purchase AARP Medigap and is thus acting as an unlicensed insurance agent of UnitedHealth.  Examples of this active solicitation include, but are not limited to, the following:

- www.aarphealthcare.com advertises details of AARP Medigap insurance and explicitly states, "**This is a solicitation of insurance.**" (Emphasis in original.)

- www.aarphealthcare.com explains some of the terms of the policies that are offered: "A Medicare Supplement Insurance Plan, such as an AARP Medicare Supplement Insurance Plan insured by UnitedHealthcare Insurance Company, may help pay some of the health care costs that Medicare Parts A and B don't cover like copayments, coinsurance and deductibles for Medicare approved services. Your coverage travels with you throughout the U.S. and there are virtually no claim forms to file.  Medicare Supplement Insurance plans also let you keep your own doctors and specialists who accept Medicare patients — *and you never need to get a referral!*"  (Emphasis in original.)

- www.aarpmedicareplans.com provides even greater detail about the AARP Medigap plans that are offered and allows users to enter their Florida zip code to "View Plans & Pricing."

- www.aarpmedicareplans.com also explicitly states, "**This is a solicitation of insurance.**"  (Emphasis in original.)

- AARP television and Internet video advertisements promoting the AARP Medigap plans also display the same language, "**This is a solicitation of insurance.**"  (Emphasis in original.)

- Print advertisements for the AARP Medigap plans in the **AARP Bulletin** magazine note: "**This is a solicitation of insurance.**"  (Emphasis in original.)

- These same print advertisements provide a toll free phone number, 1-866-314-8679, to call "AARP Health" in order to receive a free information kit to "Tell me more about AARP Medicare Supplement Insurance Plans."  The reader is also encouraged to "Call to receive complete information including benefits, costs, eligibility requirements, exclusions and limitations."

- AARP Member Advantages (formerly AARP Health) is "a collection of products, services and insurance programs made available by AARP."  The page also notes that "AARP knows you want quality, affordable health care. And through

14

relationships with leading companies, AARP makes available a range of health products, services and discounts."

55.     For every AARP Medigap policy sold/renewed, AARP collects insureds' premium payments, plus the 4.95% commission, through the AARP Trust on behalf of UnitedHealth.

56.     After deducting the 4.95% commission from the consumers' payment and remitting this amount to AARP, Inc. and ASI, AARP then invests the insurance premiums that it collects for UnitedHealth in a wide range of securities. ***UnitedHealth gives AARP the right to retain any gains on those investments, in addition to its 4.95% commission.*** In 2009, 2010, 2011 and 2012, AARP earned $89,985,195, $56,668,525, $14,484,000 and $59,191,000, respectively, on the investment of premiums that it held in the AARP Trust prior to remittance of the premiums due to UnitedHealth.

57.     As premium payments become due, the AARP Trust remits the premiums to UnitedHealth.

58.     The 4.95% commission amount paid to AARP from the AARP Trust is bifurcated, with 8% going to ASI and 92% going to AARP, Inc. The left side of a chart from the House Ways and Means Committee members' report, *Behind the Veil: The AARP America Doesn 't Know*, demonstrates how AARP receives its commissions from the AARP Trust:



CHART 5: Flow of AARP Medicare-Related Royalty Payments

59.     Contrary to the above chart, however, AARP's 4.95% commission is not deducted from the actual insurance premiums paid by consumers.  According to the Agreement, ***AARP's commission is charged to consumers <u>on top</u> of the premiums for the actual insurance coverage***:  "SHIP GROSS PREMIUMS for a Policy Year means the amount of Member Contributions minus the AARP allowance determined under Section 6.1 hereof for such policy year."  The Agreement distinguishes between the amount actually billed to and paid by consumers (i.e., "Member Contributions") and the insurance premiums themselves.

60.     Consistent with this provision in the Agreement, Barry Rand, the CEO of AARP, testified before the House Ways and Means Committee on April 1, 2011, that "royalties have nothing to do with the premiums of beneficiaries.  Nothing to do with the premiums."  Mr. Rand also testified that "[a]ll of the money that we have that comes out of the trust in interest goes to

our mission.  None of the money is taken out of any of the premiums."[3]

61.     In addition, AARP's then President, W. Lee Hammond, testified the royalty payment was in addition to the premiums for insurance coverage:  "We do take royalty payments from that money that comes in, and then, as requested by the insurance companies to cover their products, we return the balance of that money to them."[4]

62.     Mr. William Josephson, Of Counsel at Fried, Frank, Harris, Shriver and Jacobsen, LLP, and former Assistant Attorney General-in-Charge of the New York State Law Department's Charities Bureau, testified at the hearing that the evidence may suggest "the amounts characterized by AARP as royalty really are closer to insurance commissions, which I believe would be subject to unrelated business income tax.  This is a factual inquiry that is not necessarily resolved by questions of law."[5]

63.     Thus, while Defendants disclose the existence of a payment in general to AARP which they term a "royalty" paid for the use of AARP's intellectual property, Defendants hide the fact that the cost of AARP Medigap insurance includes a percentage-based commission to AARP that is funded by consumers, in addition to the insurance premium paid to UnitedHealth for coverage.

64.     Defendants affirmatively state in their AARP Medigap disclaimer language the following:

> Premiums are collected from you on behalf of the trustees of the
> [AARP] Trust.  These premiums are used to pay expenses incurred
> by the Trust in connection with the insurance programs and to pay
> the insurance company for your insurance coverage.  Income
> earned from the investment of premiums while on deposit with the

---

[3] https://waysandmeans.house.gov/hearing-on-aarps-organizational-structure-management-and-finances/.
[4] *Id.*
[5] *Id.*

Trust is paid to AARP and used for the general purposes of AARP and its members.

65. This statement is highly misleading and deceptive in that Defendants do not disclose that in addition to paying for the actual insurance coverage, and the administrative expenses incurred by the AARP Trust, 4.95% of the insured's payment is diverted to AARP as an illegal commission.

66. Defendants' misrepresentations and omissions regarding AARP Medigap constitute an unfair, deceptive, and misleading practice in violation of the Code.

**Defendants' Conduct Is Unlawful Under the Florida Insurance Code**

67. At all material times, UnitedHealth authorized AARP to act as its agent in the marketing, solicitation and sale of AARP Medigap policies.

68. At all material times, AARP acted as the authorized agent of UnitedHealth in the transaction of health insurance, and therein engaged in the following acts:

(a) solicited the sale and renewal of insurance on behalf of UnitedHealth;

(b) solicited an application for insurance on behalf of UnitedHealth;

(c) received, collected, and/or transmitted an insurance premium to UnitedHealth; and

(d) generally aided in the transaction of the business of insurance.

69. While AARP acts as an insurance agent, it is not licensed to act as such in the State of Florida - a clear violation of the Code. See Fla. Stat. Ann. §§ 626.838, 626.112

70. And UnitedHealth has also violated the Code by authorizing AARP to act as its agent while knowing that AARP is not duly licensed. *See id.*

71. Because AARP is not licensed as an insurance agent, it is therefore self-evident that AARP may not collect a commission for its marketing, solicitation or sale/renewal of AARP Medigap policies on behalf of UnitedHealth, and UnitedHealth may not pay such an illegal

18

commission when it knows AARP is unlicensed.

**Defendants' Scheme Has Caused Injury to Plaintiff and the Class**

72.    The end result of Defendants' violations of the Code (which are not disclosed to consumers) is that consumers are charged an artificially inflated insurance price, above and beyond the premiums remitted to UnitedHealth for coverage, that is prohibited by law, and which therefore should not be charged.

73.    Other Medigap policies offered without the highly regarded "AARP brand" offer *identical* benefits often at a lower cost in part because those insurers do not secretly charge unlawful insurance agent commissions to consumers.

74.    Defendants' deceptive and unlawful scheme takes advantage of unsuspecting senior citizens who all put their trust in the AARP name, in violation of the Code.

75.    As a result of Defendants' unlawful acts and conduct, consumers are harmed financially in that they are paying 4.95% above the actual cost of insurance coverage so that UnitedHealth and AARP can secretly divert this 4.95% illegal commission to the unlicensed AARP.

76.    But for Defendants' deceptive and unlawful acts, Plaintiff and the other members of the Class would not have paid the illegal commission as part of their purchase and/or renewal of their AARP Medigap policies.

77.    Put simply, Plaintiff and the Class were injured by the actual loss of the 4.95% commission payments and paid more for AARP Medigap because of Defendants' challenged conduct.

## CLASS ALLEGATIONS

78.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the

Federal Rules of Civil Procedure, individually, and on behalf of the following Class:

> All persons in the State of Florida who purchased or renewed an
> AARP Medigap policy.

79.     Subject to additional information obtained through further investigation and

discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or

amended complaint.

80.     Specifically excluded from the Class are Defendants, Defendants' officers,

directors, agents, trustees, parents, children, corporations, trusts, representatives, employees,

principals, servants, partners, joint venturers, or entities controlled by Defendants, and their

heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants

and/or Defendants' officers and/or directors, the judge assigned to this action, and any member

of the judge's immediate family.

81.     **Numerosity.**  The members of the Class are geographically dispersed throughout

the State of Florida and are so numerous that individual joinder is impracticable.  Upon

information and belief, Plaintiff reasonably estimates that there are hundreds of thousands of

members in the Class.  Although the precise number of Class members is unknown to Plaintiff,

the true number of Class members is known by Defendants.  More specifically, UnitedHealth

maintains databases that contain the following information: (i) the name of each Class member

enrolled in an AARP Medigap policy; (ii) the address of each Class member; and (iii) each Class

member's payment information related to AARP Medigap.  Thus, Class members may be

identified and notified of the pendency of this action by first class mail, electronic mail, and/or

published notice, as is customarily done in consumer class actions.

82.     **Existence and predominance of common questions of law and fact.**  Common

questions of law and fact exist as to all members of the Class and predominate over any

questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

(a)      whether AARP solicited an application for insurance in the State of Florida and/or aided in the transaction of the business of an insurer without a license in violation of Fla. Stat. Ann. §§ 626.838, 626.112;

(b)      whether AARP acted as an authorized agent of an insurer without a license in violation of Fla. Stat. Ann. §§ 626.838, 626.112;

(c)      whether UnitedHealth appointed AARP to act as its authorized agent while AARP did not hold a license to do so in violation of Fla. Stat. Ann. §§ 626.838, 626.112;

(d)      whether UnitedHealth paid, and AARP accepted, a commission for services performed by AARP as an agent in the State of Florida while AARP did not hold a license to act as an agent in violation of Fla. Stat. Ann. §§ 626.838, 626.112;

(e)      whether AARP transacted or solicited insurance, or collected a payment in connection with an application for insurance or the issuance of a policy, other than one allowed by the Code;

(f)      whether Defendants have unlawfully converted money from Plaintiff and the Class;

(g)      whether Defendants are liable to Plaintiff and the Class for unjust enrichment;

(h)      whether Defendants are liable to Plaintiff and the Class for fraudulent concealment;

(i)      whether Plaintiff and the Class have sustained monetary loss and the proper measure of that loss;

(j)      whether Plaintiff and Class are entitled to declaratory and injunctive relief; and

(k)      whether Plaintiff and the Class are entitled to restitution and disgorgement from Defendants.

83.      **Typicality.**  Plaintiff's claims are typical of the claims of the other members of the Class in that Defendants deceived Plaintiff in the very same manner as they deceived each member of the Class.

84.      **Adequacy of Representation.**  Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class.  Furthermore, Plaintiff has no interests that are antagonistic to those of the Class.

85.      **Superiority.**   A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense of individual litigation of their claims against Defendants.  It would, thus, be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

86.      In the alternative, the Class may also be certified because:

(a)      the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendants;

(b)      the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)      Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

<u>COUNT I</u>
**(CONVERSION)**

87.      Plaintiffs incorporates by reference the foregoing paragraphs of this Complaint as if fully stated herein.

88.      Plaintiff and the Class have an ownership right to the 4.95% of their payments illegally diverted to AARP as a commission.

89.      Defendants have wrongly asserted dominion over the 4.95% of these payments illegally diverted to AARP as a commission.  Defendants have done so every month that Plaintiff and the Class have paid premiums for their AARP Medigap insurance policies, including in January 2018.

90.      As a direct and proximate cause of Defendants' conversion, Plaintiff and the Class suffered damages in the amount of the 4.95% of the payments for insurance illegally diverted to AARP as a commission.

23

## COUNT II
### (UNJUST ENRICHMENT)

91.     Plaintiffs incorporates by reference the foregoing paragraphs of this Complaint as if fully stated herein.

92.     Plaintiff and the Class conferred a benefit on Defendants in the form of the 4.95% of their payments illegally diverted to AARP as a commission.  Plaintiff and the Class have conferred this benefit every month that they have paid premiums for their AARP Medigap insurance policies, including in January 2018.

93.     Defendants voluntarily accepted and retained this benefit.

94.     Because this benefit was an illegal commission, it would be inequitable for the Defendants to retain it without paying the value thereof.

## COUNT III
### (FRAUDULENT CONCEALMENT)

95.     Plaintiffs incorporates by reference the foregoing paragraphs of this Complaint as if fully stated herein.

96.     Defendants concealed or failed to disclose a material fact to Plaintiff and the Class, to wit that 4.95% of Plaintiff's premium payments were being illegally diverted to AARP as a commission.

97.     Defendants knew or should have known that this material fact should be disclosed or not concealed.

98.     In so concealing this material fact, Defendants acted in bad faith.

99.     Defendants knew that by concealing or failing to disclose the material fact, Plaintiff and the Class would be induced to act by purchasing an AARP-endorsed Medigap plan.

100.     Plaintiff and the Class suffered damages as a result of the concealment or failure

to disclose in the form of the premium payments that they have made to Defendants.

101.    Defendants had a duty to speak given that they were parties to transactions with Plaintiff and the Class, they had a duty to say enough to prevent their words from misleading Plaintiff and the Class, and they had special knowledge about the materials facts that Plaintiff and the Class did not possess.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendanst, as follows:

A.    That Defendants be cited according to law to appear and answer herein; and upon final hearing a PERMANENT INJUNCTION be issued, restraining and enjoining Defendants, Defendants' successors, assigns, officers, agents, servants, employees and attorneys and any other person in active concert or participation with Defendants, from engaging in the acts or practices complained of herein;

B.    For an Order requiring Defendants to restore all money or other property taken from identifiable persons by means of unlawful acts or practices and award judgment for damages and restitution in an amount within the jurisdictional limits of this Court to compensate for such losses;

C.    For an Order requiring the disgorgement of all sums taken from consumers by means of deceptive practices, together with all proceeds, interest, income, profits and accessions thereto;

D.    That the Court certify this action and the Class as requested herein, appointing Plaintiff as Class Representative, and appointing Bursor & Fisher, P.A. as Class Counsel;

E.    Award Plaintiff and the Class members court costs and reasonable and necessary attorneys' fees in relation to the amount of work expended, and any other relief the Court determines is proper; and

F.    Provide such other and further relief as the Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  February 8, 2018                     Respectfully submitted,

                                             **BURSOR & FISHER, P.A.**

                                             By: ___*/s/ Scott A. Bursor*_____
                                                 Scott A. Bursor (State Bar No. 68362)

                                             888 Seventh Avenue
                                             New York, NY 10019
                                             Telephone: (212) 989-9113
                                             Facsimile: (212) 989-9163
                                             Email:   scott@bursor.com